## HAWKINS POINT LIGHT-HOUSE CASE.

### CHAPPELL *v.* WATERWORTH.

(*Circuit Court, D. Maryland.   June 21, 1889.*)

1. NAVIGABLE WATERS—SUBMERGED SOIL—RIGHTS OF UNITED STATES.
   In ejectment for the site of a light-house in Patapsco river, erected by the United States as a necessary aid to navigation, the plaintiff's case was that he held a grant from the state of Maryland of the submerged soil upon which the structure stood, and that it had not been condemned, nor any compensation paid or tendered for it, and that he had also, as riparian owner of the neigh-

boring shore, the right to improve out into the river over the light-house s'te. *Held*, that the private interest in the submerged soil at the bottom of the river which had been granted to the plaintiff, was subject to the paramount right of the public to use the river for navigation, and of the United States, in the regulation of commerce, to erect thereon such aids to navigation as were reasonably necessary; and that the plaintiff's right to improve out into the river, until actually availed of, was subject to the right of the United States to use the soil under the water in aid of navigation without the plaintiff's consent, and without compensation.

**2. SAME—EMINENT DOMAIN—COMPENSATION.**

*Held, also,* that the United States in constructing, by authority of congress, a necessary light-house upon soil under the water of the river, was exercising a right in aid of the public right of navigation, to which the plaintiff's private ownership in the submerged soil was necessarily subservient, and that by such use the United States was not taking private property, **within the meaning** of the fifth amendment of the federal constitution.

*(Syllabus by the Court.)*

At Law. Ejectment.

*John P. Poe* and *F. P. Stevens*, for plaintiff.

*Thomas G. Hayes*, U. S. Dist. Atty., by direction of the attorney general, appeared for defendant; and on behalf of the defendant, and of the United States, filed the following brief:

"This is an action of ejectment brought by the plaintiff against the defendant to recover the possession of the site of Hawkins Point Light-House, situated in the Patapsco river, the same being one of the range lights of Brewerton channel. The defendant is the keeper of said light-house, he having been appointed in conformity with the acts of congress by the light-house board. The suit was instituted in the circuit court for Anne Arundel county, and under the provisions of the act of March 3, 1887, c. 373, was removed to the circuit court of the United States for the district of Maryland. The plaintiff claims title to the fast land adjacent to that part of the Patapsco river where the light-house is located, through a grant from the state of Maryland to his grantor, J. M. Johnson, in March, 1859. He also asserts title to the submerged land on which is located the light-house from the same grantor, who received a patent from the state of Maryland for it in the year 1861. The plaintiff also relies on his riparian rights under the act Md. 1862, c. 129. Code 1888, art. 54, §§ 44–46. The site involved in this suit is thus described in the defendant's plea: 'That portion of said submerged land used as a site for the Hawkins Point Light Station, and embracing so much of said submerged land as is necessary to hold and support nine iron piles, eighteen inches in diameter, on which piles, at the distance of twelve feet above mean high tide, the wooden structure of the said light-house is placed. The said wooden structure resting upon said piles is a square area twenty-seven feet square. The center pile of said nine piles is at the center of the said square superstructure, and is situated at a point distant    *    *    * from the ordinary high-water mark of the adjacent shore 210 feet, more or less.' All the rest of the land described in the declaration the defendant, for himself and on behalf of the United States, denies being in possession of, and files a formal disclaimer of any right or title to the same. The light-house in question was erected on its present site in 1868 by the light-house board, in pursuance of the acts of congress. There was no condemnation nor compensation paid to any one for said site. It ever since has been in the possession of the United States, and used as one of the lights to aid in the navigation of Brewerton channel, in the Patapsco river; the said river being one of the public navigable rivers of the United States, and within the limits of the state of Maryland.

"The defendant, on behalf of himself and the United States, contends that the right of possession of the site in question is in the United States. His position as to this claim is as follows: The title to the land at the bottom of the navigable rivers of the United States, it is admitted, is in the state through whose territory these waters flow. This title of the state to these lands and waters is, however, subject to the public easement of navigation and fishery, or, perhaps, more accurately stated, the state's title is in trust for these public uses. This title of the state is exactly the same kind of title which was held by Great Britain before the Revolution, which title was subject to this easement when in the king of England. By conquest the states became the owners of these submerged lands at the bottom of the navigable waters, subject to this easement or trust. The states under the national compact surrendered or relinquished to the federal government the regulation and enforcement of this easement or trust as to commerce and navigation. Lands at the bottom of the navigable waters of the United States are therefore, as to their use for commerce and navigation, public property, and not private property, and are so taken and considered, when required by the United States for these purposes. The title to these lands in the state being subject to this easement or trust, enforceable by the United States under the constitution, which empowers congress to regulate foreign and interstate commerce, the grantees of the state take a title to these lands subject to the same limitations and public uses. In aid of commerce or navigation, the United States has therefore the right to use the bottom of navigable rivers for the construction of a light-house,—an aid to navigation. This right of the United States to use these lands for purposes of commerce is paramount to any right of the state or its grantees under the title of the state to these lands and waters. This user by the United States of these lands and waters, which are public, and not private, property, for the purposes aforesaid, can be exercised by the United States without condemnation or payment of any consideration either to the state or its grantees.

"*Authority of Congress to Build Light-Houses.* The light-house board, of which the secretary of the treasury is *ex officio* president, is, by congress, charged with the location, construction, and general management of all light-houses. The light-house board constructed Hawkins Point Light-House in 1868, under an act of congress which appropriates 'for the establishment of beacon lights to mark Brewerton channel, Patapsco river, thirty thousand dollars.' Section 4658, Rev. St.; Act July 28, 1866, (14 St. at Large, 313.)

"*Title of State to Submerged Lands.* The title of the state to the land at the bottom of the navigable rivers within its limits is quite different from the title it holds to its uplands forming part of its public territory. The former is held, together with the water which covers them, by the state, in its capacity as a sovereign, for the public use and enjoyment of all its citizens. There is attached to this title a trust, to-wit, for the use and benefit of all its citizens in navigation and fishery. The state cannot divest its title of this trust. A grant by the state of such lands conveys a title subject to this trust. The title of the state to its uplands forming its public territory is an absolute and unqualified fee. The state's title to the lands submerged by the waters of the navigable rivers is exactly the same as was the title of the king to these lands before the Revolution. These lands belonged to the king of Great Britain as a part of the *jura regalia* of the crown. They were held as a royal prerogative for the benefit of the people at large. The same kind of title devolved on the state after the Revolution, subject to the rights surrendered by the states to the United States under the constitution. The right to regulate commerce between the states, foreign nations, and the Indian tribes, was, by article 1, § 8, of the constitution, surrendered by the states to the federal government, and by the same instrument this right is made exclusive, plenary, and paramount. This title to submerged lands has been frequently passed on by the

courts, both federal and state. In the case of *Martin* v. *Waddell* the supreme court of the United States elaborately discussed the character of these titles. Chief Justice TANEY, in delivering the opinion of the court in that case, said: 'For when the revolution took place the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government.' 16 Pet. 410. In another case the supreme court of the United States, by Mr. Chief Justice WAITE, in defining the title of Virginia to the beds of her navigable rivers, said: 'The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States.' *McCready* v. *Virginia*, 94 U. S. 391. In Maryland the same doctrine has been held by its court of appeals. In *Day* v *Day*, Judge COCHRAN says: 'The common-law distinction between navigable waters, and rivers or streams not navigable, is founded on the difference of the rights to which they are respectively subject; the entire property of the former being vested in the public, while the latter belong to riparian proprietors, although in some cases subject to a qualified public use. Rivers or streams within the ebb and flow of tide, to high-water mark, belong to the public, and in that sense are navigable waters; all the land below high-water mark being as much a part of the *jus publicum* as the stream itself.' 22 Md. 537. The same law is announced in an early case, (1821,) as to Lord Baltimore's title to submerged lands. *Browne* v. *Kennedy*, 5 Har. & J. 203.

"*The Right of the United States to Take Submerged Land for the Site of a Light-House without Condemnation or Compensation.* It is submitted that the following general propositions are true, and are firmly established by the judicial decisions of the federal courts: (1) The ownership of the state in the soil under navigable waters is subservient to the public right of navigation, the regulation of which as to certain commerce has been surrendered by the states to the United States. This soil cannot be used either by the state or its grantees so as to interfere with this right, the regulation of which, as vested in the United States, is exclusive, plenary, and paramount. (2) This public right is an easement on the title of the state and its grantees in these lands, enforceable by the United States, and for the enjoyment of such easement such erections may be made by the United States as are necessary for the beneficial use of the easement in question. (3) These submerged lands, with the waters, are public property, and not private property, and, when the United States needs any of these lands for purposes of commerce or navigation, it can take them without condemnation, or compensation either to the state or its grantees.

"These propositions are supported by numerous decisions of the supreme court and circuit courts of the United States, as well as by the opinions of the attorney generals of the United States. The following is a list of the most important of such cases and opinions: 15 Op. Attys. Gen. 50, Mr. Pierrepont; 16 Op. Attys. Gen. 535, Mr. Devens; *Gibbons* v. *Ogden*, 9 Wheat. 190; *Martin* v. *Waddell*, 16 Pet. 410, 413; *Pollard* v. *Hagan*, 3 How. 230; *Gilman* v. *Philadelphia*, 3 Wall. 713; *South Carolina* v. *Georgia*, 93 U. S. 4; *McCready* v. *Virginia*, 94 U. S. 391; *Telegraph Co.* v. *Telegraph Co.*, 96 U. S. 1; *Boom Co.* v. *Patterson*, 98 U. S. 403; *Mobile Co.* v. *Kimball*, 102 U. S. 691; *Hoboken* v. *Railroad Co.*, 124 U. S. 656, 8 Sup. Ct. Rep. 643; *Bridge Co.* v. *Hatch*, 125 U. S. 12, 8 Sup. Ct. Rep. 811; *Stockton* v. *Railroad Co.*, 32 Fed. Rep. 19; *Illinois* v. *Railroad Co.*, 33 Fed. Rep. 730. The states surrendered to the United States the entire control over commerce with foreign nations, between the states, and with the Indian tribes. Article 1, § 8, Const. U. S. The power of congress to regulate commerce was stated by

Mr. Chief Justice MARSHALL to include the power to regulate navigation. *Gibbons* v. *Ogden*, 9 Wheat. 190. The power to establish light-houses and buoys and beacons is held to be embraced in the commercial power of congress. Mr. Justice FIELD said: ' Buoys and beacons are important aids, and sometimes are essential, to the safe navigation of vessels, in indicating the channel to be followed at the entrance of harbors and in rivers, and their establishment by congress is undoubtedly within its commercial power.' *Mobile Co.* v. *Kimball*, 102 U. S. 691. The question as to the right of the United States to use the bottom of navigable rivers for various structures has frequently arisen in late years in the supreme court of the United States, and that court invariably has sustained the paramount right of the United States to use the bottom of these rivers for any purpose affecting commerce, even against the protest of the state, which it was conceded held the legal title. In the recent case of *Boom Co.* v. *Patterson*, a question arose as to the respective rights of the state of Minnesota and the United States to the use of the bottom of the Mississippi river for a log boom. The construction of these log booms, as set forth in the case, consisted of building piers on the bottom of the river, and then connecting these piers by boom sticks, forming a pen in which the logs were floated and stored,—a kind of log warehouse. The question arose in the condemnation of an island owned by Patterson by the company for a log boom, the company claiming that Patterson was only entitled to the value of the island as land without considering its availability for a boom, as no one else could use it for that purpose, as under their charter from Minnesota they had the exclusive privilege. The supreme court rejected this view, and in stating that the right of the company was not exclusive, because the United States could grant the same privilege to another, Mr. Justice FIELD said: ' Moreover, the United States, having paramount control over the river, may grant such license if the state should refuse one.' 98 U. S. 403. If the United States, against the consent of a state, can grant a license to build a log warehouse on the bottom of the Mississippi river, can it be doubted that nine piles can be driven by the United States in the Patapsco river to support a light-house to direct navigators in navigating Brewerton channel, against the consent of the grantee of the state?

"In another case the supreme court, in commenting on the title of New Jersey and its grantees to the submerged land in front of the city of Hoboken, by Mr. Justice MATTHEWS said: ' Over these lands it [N. J.] had absolute and exclusive dominion, including the right to appropriate them to such uses as might best serve its views of the public interest, subject to the power conferred by the constitution upon congress to regulate foreign and interstate commerce.' *Hoboken* v. *Railroad Co.*, 124 U. S. 656, 8 Sup. Ct. Rep. 643. Mr. Justice BRADLEY, speaking for the supreme court, in commenting upon the respective powers of the state and United States over the navigable waters, and the erection and removal of structures on the bottom of these rivers, said: ' And although, until congress acts, the states have the plenary power supposed, yet, when congress chooses to act, it is not concluded by anything that the states or that individuals, by its authority or acquiescence, have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose.' *Bridge Co.* v. *Hatch*, 125 U. S. 12, 8 Sup. Ct. Rep. 811. In 1875 a question arose as to the right of the United States to locate in the bed of the Saginaw river two range lights without first obtaining the title to the sites. The secretary of the treasury requested the opinion of Mr. Pierrepont, the attorney general, on the question. On September 20, 1875, he replied: ' I would respectfully submit that, in my judgment, the United States have the right to erect range lights in the waters of the Saginaw river without reference to

the ownership of the adjacent lots or any permission from riparian proprietors. * * * The state of Michigan has a right of eminent domain over the soil under its navigable rivers, and it has been held that this soil was not at all granted to the United States, but reserved to the state; but the latest decisions of the supreme tribunal reiterate that the state sovereignty over the beds of navigable streams is only for municipal purposes, never to be so used as to affect the exercise of any national right of eminent domain or jurisdiction. To amount to an exercise of this national right of eminent domain might require some unequivocal expression of such a purpose, like a law expressly authorizing the placing of range lights at the entrance of Saginaw river.' 15 Op. Attys. Gen. 50.

"In 1880, under an act of congress appropriating money to improve Oakland harbor, in California, under the approval of the secretary of war, it became necessary to erect training walls in the bed of a navigable estuary below high-water mark. A question arose as to the necessity of the United States to obtain a title to that portion of the bed of this estuary which might be needed for the training walls. The secretary of war asked the opinion of Mr. Charles Devens, then attorney general. He replied: 'The title to the lands which the United States proposes to use for the purpose of structures for the improvement of the harbor below high-water mark is derived from the state. But the state itself does not possess any right, either by virtue of its sovereignty or its ownership, which could in any way control the right of the United States, conferred by the constitution, to regulate commerce. This right includes the right to regulate navigation, and hence to regulate and improve navigable waters; and this it may do by the erection of such structures as it deems necessary for the purpose, no matter what the effect may be upon the subordinate rights of the owners of the soil covered by such navigable waters. The bed of the estuary in question being the bed of a navigable stream or a sheet of water, to the use of the harbor made by which training walls and other structures are essential, they may be used as appropriately as culverts, drains, or embankments may be for the purpose of the construction and proper enjoyment of a public road. * * * In direct answer to your inquiry, I am of opinion that the United States has a legal right to use the bed of the estuary in question for the purpose of said improvement by the erection of training walls or any other appropriate structure, and that the owners of the soil can make no complaint of such use.' 16 Op. Attys. Gen. 536. In 1874–75 congress appropriated $120,000 for the improvement of the harbor of Savannah, Ga., and directed that this amount should be expended under the direction of the secretary of war. Above the city of Savannah the Savannah river is divided by Hutchinson island into a northern and southern channel, the northern channel being within the territorial limits of South Carolina. The secretary of war decided that the harbor of Savannah would be improved by the closing of the northern channel; the increased depth of water and the scouring effect of a more rapid current in the channel would improve the harbor of Savannah. The secretary of war, therefore, directed that the northern channel should be closed by a dam. The state of South Carolina, in South Carolina v. Georgia, endeavored to prevent the closing of the northern channel, and filed a bill in equity in the supreme court of the United States against the state of Georgia, and made the secretary of war and United States engineers engaged in the work co-defendants. The bill was filed to obtain an injunction to prevent the obstruction or interruption of the navigation of the Savannah river. The supreme court refused the relief sought, holding that the power of the United States over the navigable waters of the United States for the purposes of commerce and navigation was plenary, paramount, and exclusive; that the power granted by the commercial clause of the constitution to the United State was as full and as complete as that possessed by the states

over their navigable waters before the adoption of the constitution. The court in that case expressly held that the United States may build light-houses upon the submerged lands of the navigable rivers. Its exact language is: 'It may build light-houses in the bed of the stream.' The state of South Carolina in this case also denied that congress had given any authority to the secretary of war to close the northern channel, inasmuch as there was no express law directing him to do so, but that the only authority for the act was to be found in the law appropriating the amount for the improvement of the harbor of Savannah. The supreme court held that this was ample power, and that no other authority was necessary. The court, in its opinion, reviews the extent of the power of congress over the beds and waters of navigable rivers for the purpose of commerce and navigation. Mr. Justice STRONG said; 'Prior to the adoption of the federal constitution, the states of South Carolina and Georgia together had complete dominion over the navigation of the Savannah river. By mutual agreement they might have regulated it as they pleased. It was in their power to prescribe, not merely on what conditions commerce might be conducted upon the stream, but also how the river might be navigated, and whether it might be navigated at all. * * * They had plenary authority to make improvements in the bed of the river, to divert the water from one channel to another, and to plant obstructions therein at their will. This will not be denied; but the power to "regulate commerce," conferred by the constitution upon congress, is that which previously existed in the states, as was said in *Gilman* v. *Philadelphia*, 3 Wall. 724: "Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable rivers of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by congress." ' In the same case, in referring to the power of congress to place obstructions to navigation in the bed of navigable rivers, the court said: 'If it were, every structure erected in the bed of the river, whether in the channel or not, would be an obstruction. It might be a light-house erected on a submerged sand bank, or a jetty pushed out into the stream to narrow the water-way, and increase the depth of water and the direction and the force of the current. * * * The impediments to navigation caused by such structures are, it is true, in one sense, obstructions to navigation; but, so far as they tend to facilitate commerce, it is not claimed that they are unlawful. * * * It is not, however, to be conceded that congress has no power to order obstructions to be placed in the navigable waters of the United States. * * * It may build light-houses in the bed of the stream. It may construct jetties.'

"The navigable waters of the United States, with their beds, for the purpose of commerce and navigation, being the 'public property of the nation,' when any portion of this property is required by the United States for its uses in aid of navigation there is no condemnation necessary. It is only necessary for congress to 'order' the taking of the part needed for the specified use. An appropriation act naming the river or harbor to be improved and appropriating the necessary money is sufficient. In *South Carolina* v. *Georgia*, on the question as to what was the required authority from congress to close the northern channel, Mr. Justice STRONG said: 'The plaintiff next contends that, if congress has the power to authorize the construction of the work in contemplation and in progress, whereby the water will be diverted from the northern into the southern channel of the river, no such authority has been given. With this we cannot concur. By an act of congress of June 23, 1874, (18 St. at Large, 204,) an appropriation was made of $50,000, to be expended under the direction of the secretary of war, for the repairs, preservation, and completion of certain public works, and, *inter alia*, "for the im-

provement of the harbor of Savannah." The act of March·3, 1875, (18 St. at Large, 459,) made an additional appropriation of $70,000 "for the improvement of the harbor of Savannah, Georgia." It is true that neither of these acts directed the manner in which these appropriations should be expended. The mode of improving the harbor was left to the discretion of the secretary of war, and the mode adopted, under his supervision, plainly tends to the improvement contemplated.' 93 U. S. 4.

"In another case the supreme court was called upon to define the power of congress over the navigable rivers of the United States for the purposes of commerce and navigation. The question arose in the case of *Telegraph Co.* v. *Telegraph Co.* Congress, by act of 24th July, 1886, gave to all telegraph companies who complied with the requirements of the act the right to run their lines ' through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States, which have been, or may hereafter be, declared such by act of congress, and over, under, or across the navigable streams or waters of the United States.' In construing this section of the act, the supreme court held that the dominion of the United States over the navigable waters for the purpose of commerce is the same as it is over the public domain. Mr. Chief Justice WAITE, in delivering the opinion of the court, said: 'It is insisted, however, that the statute extends only to such military and post roads as are upon the public domain; but this, we think, is not so. The language is, "through and over any portion of the public domain of the United States, * * * and over, under, or across the navigable streams or waters of the United States." There is nothing to indicate an intention of limiting the effect of the words employed, and they are therefore to be given their natural and ordinary signification. Read in this way, the grant evidently extends to the public domain, the military and post roads, and the navigable waters of the United States. These are all within the domain of the national government, to the extent of the national powers, and are therefore subject to legitimate congressional regulation. No question arises as to the authority of congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted.' 96 U. S. 1.

"If congress has the power to grant to a telegraph company the use of the bed of a navigable river for its poles to support its wires running ' over ' and ' across ' said streams, or the bed of these rivers to support its cable or wires as they pass ' under' these rivers, can it be doubted that congress can empower the light-house board to use the beds of navigable rivers for the purpose of placing in them the iron posts or poles to support the superstructure of a light-house? In a very recent case this very question has arisen, as to the character of the title of the state to the bottom of the navigable rivers as against the United States, when needed, taken, or granted by the United States for the purposes of commerce and navigation. The question arose in the circuit court of the United States for the district of New Jersey in *Stockton* v. *Railroad Co.* This railroad company in constructing its bridge, under a grant from congress, across the Arthur kill, a navigable water-way running between the states of New Jersey and New York, had taken the bottom of this stream below high-water mark on the New Jersey side for its central and western pier, without' condemnation or grant from the state of New Jersey. This state resisted this taking by the company, claiming that it was private property belonging to the state, and that congress had no power to grant its use to a railroad company. It was otherwise held by the court, and in an elaborate and able opinion it was decided that it was not private property, and that the title of the state was in trust for the purposes of commerce and navigation, and that the United States had the right, under the commercial clause

of the constitution, to take it or grant it for this purpose. This decision sustained the taking of the river bottom for the pier of a bridge, which had nothing to do with the navigation of the river, but upon the contrary might be and was an obstruction to its navigation; but how much more apparent, therefore, must be the right of the United States to use the beds of navigable streams for a light-house, the sole purpose of the light being to directly aid commerce and navigation. In delivering the opinion of the court Mr. Justice BRADLEY said: 'The information rightly states that, prior to the Revolution, the shore and lands under water of the navigable streams and waters of the province of New Jersey belonged to the king of Great Britain as part of the *jura regalia* of the crown, and devolved to the state by right of conquest. The information does not state, however, what is equally true, that after the conquest the said lands were held by the state as they were by the king, in trust for the public uses of navigation and fishery, and the erection thereon of wharves, piers, light-houses, beacons, and other facilities of navigation and commerce. Being subject to this trust, they were *publici juris;* in other words, they were held for the use of the people at large. It is true that to utilize the fisheries, especially those of shell-fish, it was necessary to parcel them out to particular operators, and employ the rent or consideration for the benefit of the whole people, but this did not alter the character of the title. * * * Such being the character of the state's ownership of the land under water,—an ownership held, not for the purpose of emolument, but for public use, especially the public use of navigation and commerce,—the question arises whether it is a kind of property susceptible of pecuniary compensation, within the meaning of the constitution. The fifth amendment provides only that private property shall not be taken without compensation, making no reference to public property. * * * It is not so considered when sea walls, piers, wing-dams, and other structures are erected for the purpose of aiding commerce by improving and preserving the navigation. * * * It matters little whether the United States had or has not the theoretical ownership and dominion in the waters or the land under them; it has, what is more, the regulation and control of them for the purposes of commerce. * * * We think that the power to regulate commerce between the states extends not only to the control of the navigable waters of the country, and the lands under them, for the purposes of navigation, but for the purpose of erecting piers, bridges, and all other instrumentalities of commerce which, in the judgment of congress, may be necessary or expedient.' 32 Fed. Rep. 19.

"The title of the state of Maryland to the soil beneath the waters of navigable rivers and the waters of these rivers within her territorial limits, for municipal purposes as well as for fisheries, is not for one moment questioned or denied by the United States. The claim of the United States is that this title of the state and its grantees to these lands is subject to a paramount public easement of navigation, the beneficial enjoyment of which is in the people of the United States, and the enforcement and regulation of which has been delegated to the national government, and therefore, for the enjoyment of such easement, such erections may be made by the United States on the soil at the bottom of these rivers as are necessary for the beneficial use of the easement in question. The United States does not claim an absolute title to this land under these rivers, but simply an easement for the public uses of commerce and navigation. Nor does the United States claim by virtue of the easement civil or criminal jurisdiction over any portion of these submerged lands when taken for a light-house, under this power conferred to enforce and regulate the easement in question. If the United States desires to have the absolute title as well as a cession of jurisdiction over these sites, the state alone can give it. But as to the power and right of the United States to use these beds of the navigable rivers for aids to commerce and navigation, with-

out absolute title or cession of jurisdiction, the easement in question, under the grant of the power by the states to the United States to regulate commerce, is ample. The taking of these lands by the United States for the purposes aforesaid is the exercise of the power of eminent domain delegated to the federal government, the thing taken being public property subject to public uses. The claim of the United States, as against the plaintiff in this suit, may be stated in this proposition: The ownership of the state in the soil beneath the navigable rivers within its territorial limits is subservient to the public right of navigation, and cannot be used in any way so as to derogate from and interfere with such right. The grantees of the state take subject to this right, and any grant by the state to a person so as to be detrimental to this public right is void.

"The correctness of this view of the character of the title of the state is confirmed by the opinions of the supreme court in many cases. Mr. Justice SWAYNE said: 'The right of eminent domain over the shores and the soil under the navigable waters for all municipal purposes belongs exclusively to the states within their respective territorial jurisdiction, and they, and they only, have the constitutional power to exercise it. * * * But in the hands of the states this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by the constitution, for, although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there, as on shore, but municipal power, subject to the constitution of the United States, and the laws which shall have been made in pursuance thereof.' *Gilman* v. *Philadelphia*, 3 Wall. 713; *Pollard* v. *Hagan*, 3 How. 230.

"The state of Maryland impliedly in her laws concedes the paramount character of this easement as in the United States, and that the state has no power to impair it by her own laws. Her title to the submerged lands, it seems, she admits is not for emolument or sale for moneyed consideration to the United States. She has therefore by a public law agreed to convey both the title and to cede jurisdiction ' to the land covered by the navigable waters within the limits of the state, and on which a light-house * * * or other aids to navigation has been built, or is about to be built,' upon the request of the United States, and without any consideration. The state recognizing the existence of this paramount easement in the United States, and that her title to any part of the submerged lands in the navigable rivers in her limits is subject to this servitude, which could be exercised by the United States at any time for the purposes of commerce or navigation without her consent, very wisely decided by a general law to give to the United States both the title and jurisdiction over such portions of submerged land upon which light-houses had been or might be erected. It may be conceded that the easement, although ample to justify the use by the United States of these lands without the consent of the state, did not give title and jurisdiction to the United States over these lands, and the state, recognizing that her title with this servitude annexed was of no value, willingly consented to a gift of title and jurisdiction. Act Md. 1874, c. 193." Code 1888, art. 96, § 2.

MORRIS, J. The brief filed by the learned district attorney correctly states the case made by the pleadings, and his full citations from decisions of the supreme court applicable to the question raised make it unnecessary to quote them in this opinion.

The plaintiff by this action of ejectment seeks to dispossess the United States of a light-house built by the United States light-house board in the year 1868, under authority of congress. It is erected upon piles in

the waters of the Patapsco river, where the tide ebbs and flows, at the distance of about 210 feet from the shore, and it is one of the range lights of the main channel of the river, known as the "Brewerton Channel," which is the only approach for vessels of large draught to the port of Baltimore. In this channel the natural depth of the water-way is about 16 feet. It has been deepened to over 27 feet for the purpose of admitting large ocean steamers, and it is kept dredged out, buoyed, and lighted by the constant supervision of the proper United States authorities with appropriations made by congress. It is conceded that the Hawkins Point light, as now located, is required for the safe navigation of the channel by ships engaged in foreign commerce. It covers an area of only 27 feet square. The plaintiff has acquired by grant, and now owns, all the title and right in the upland, and the shore opposite this light-house, and in the bed of the river covered by this structure which the state could grant away, and has the riparian rights specially confered by the Maryland act of 1862, c. 129, by which it was enacted that "the proprietor of land bounding on any navigable waters of this state is hereby declared to be entitled to the exclusive right of making improvements into the waters in front of his said land. Such improvements, and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which said improvement is made." In fact, the plaintiff never has availed of this privilege of improving out into the water covered by the light-house, but the right to do so is a valuable riparian right, not to be arbitrarily or capriciously destroyed. Yates v. Milwaukee, 10 Wall. 504. It is, however, a privilege which must be exercised subject to the right of the public to use the river for the great primary and paramount purpose of navigation, and for furnishing the usual and necessary aids to navigation.

The ruling in Yates v. Milwaukee was that when under legislative permission, or in accordance with his privilege as a riparian owner, the owner of land bounding on a navigable stream has actually made his improvement, and by such improvement that portion of the stream so improved or reclaimed has ceased to be part of the navigable water, and is appropriated to private use, it can then only be taken to improve navigation upon proper compensation being made, as for any other strictly private property. Such was the effect of the mandate of the supreme court in that case in reversing the decree below. But while the submerged land remains a part of the bed of the river it is not private property, in the sense of the fifth amendment to the federal constitution. As was declared in Gilman v. Philadelphia, 3 Wall. 725, the navigable waters "are the public property of the nation, and subject to all the requisite legislation by congress." In the hands of the state or of the state's grantee the bed of a navigable river remains subject to an easement of navigation, which the general government can lawfully enforce, improve, and protect. It is by no means true that any dealing with a navigable stream which impairs the value of the rights of riparian owners

gives them a claim for compensation. The contrary doctrine, that, in order to develop the greatest public utility of a water-way, private convenience must often suffer without compensation, has been sanctioned by repeated decisions of the supreme court. The following are cases all involving that proposition: *The Blackbird Creek Case*, 2 Pet. 245; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Pound* v. *Turck*, 95 U. S. 459; *Wisconsin* v. *Duluth*, 96 U. S. 379; *South Carolina* v. *Georgia*, 93 U. S. 4.

If it were made apparent to congress that any extension of the plaintiff's present shore line into the river tended to impair the navigability of the stream, or its use as a highway of commerce, congress could authorize the agents of the United States to establish the present shore as the line beyond which no structures of any kind could be extended, and the plaintiff would have no claim for compensation. If the plaintiff could thus lawfully be prevented from appropriating to his private use any part of the submerged land lying in front of his shore-line, and the whole of it be kept subservient to the easement of navigation, how can it be successfully claimed that he must be paid for the small portion covered by the light-house 200 feet from the shore, which has been taken for a use as strictly necessary to safe navigation as the improved channel itself? The court of appeals of Maryland, whenever called upon to declare the nature of the title of the state and its grantees in the land at the bottom of navigable streams, has uniformly held that the soil below high-water mark was as much a part of the *jus publicum* as the stream itself. *Day* v. *Day*, 22 Md. 537. And in the leading Maryland case of *Browne* v. *Kennedy*, 5 Har. & J. 203, (decided in 1821,) discussing the nature of the property in the soil covered by navigable rivers in Maryland, it was said:

"It is very certain that by the common law the right [to the soil] was in the king of England, and it seems equally clear that he had the capacity to dispose of it *sub modo*. Whatever doubts are entertained on the subject, they probably have arisen from inattention to the distinction between the power of granting an exclusive privilege, in violation or restraint of a common piscarial right or other common right, as that of navigation, and the power of granting the soil *aqua cooperta*, subject to the common user. The subject has, *de communi jure*, an interest in a navigable stream, such as the right of fishing and of navigating, which cannot be abridged or restrained by any charter or grant of the soil or fishery, since *Magna Charta*, at least. But the property in the soil may be transferred by grant, subject, however, to the *jus publicum*, which cannot be prejudiced by the *jus privatum* acquired under the grant."

The same doctrine has been recently enforced, with regard to the character of the ownership of New Jersey in the lands under the navigable waters of that state, by Mr. Justice BRADLEY in *Stockton* v. *Railroad Co.*, 32 Fed. Rep. 19. It appears, therefore, that the private interest granted to the plaintiff in the soil in question was of necessity granted to him subject to the use which the United States is now making of it in aid of navigation, and that the special plea to plaintiff's action of ejectment sets up a perfect defense to the action. The plaintiff's replication to the defendant's special plea simply avers that, when pos-

session of the submerged land was taken by the United States as in the plea alleged, the plaintiff held title to it under the grants from the state, and still holds said title, and that he has never been paid or tendered any compensation therefor. This, in my opinion, is no answer to the plea, and the defendant's demurrer to it is sustained. The plaintiff electing to stand on his replication, judgment will be entered for the defendant.