## UNITED STATES v. 412.715 ACRES OF LAND, CONTRA COSTA COUNTY, CAL., et al.

### No. 22215–S.

District Court, N. D. California, S. D.

Dec. 13, 1943.

144

M. Mitchell Bourquin, Sp. Asst. to the Atty. Gen., for plaintiff.

Lyman Henry and Arthur B. Dunne, both of San Francisco, Cal., for defendant Santa Cruz Oil Corporation.

W. Reginald Jones, of Oakland, Cal., amicus curiæ.

Heller, Ehrman, White & McAuliffe and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for North Bay Realty & Development Co. and Wells Fargo Bank & Union Trust Co.

Chickering & Gregory, of San Francisco, Cal., for Central Bank and Blake Bros. Co.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for Bank of California, San Francisco & Fresno Land Co., Pacific Telephone & Telegraph Co., and Standard Oil Co. of California.

E. J. Foulds, of San Francisco, Cal., for Southern Pacific R. Co.

Jonathan C. Gibson, M. W. Reed, and Leo E. Sievert, all of Los Angeles, Cal., for Atchison, T. & S. F. Ry. Co., Southern Pacific R. Co., and Southern Pacific Co.

Morrison, Hohfeld, Foerster, Shuman & Clark, of San Francisco, Cal., for Parr-Richmond Terminal Corporation.

Robert W. Kenny, Atty. Gen., and Lucas E. Kilkenny and R. S. McLaughlin, Deputy Attys. Gen., for the State of California.

ST. SURE, District Judge.

The Government sues under the Second War Powers Act, 50 U.S.C.A. § 171, as amended, 50 U.S.C.A.Appendix § 632 to acquire land by condemnation for the construction of a naval fuel supply depot to serve the Pacific Fleet. The land described in the complaint consists of uplands near Molate Point in San Francisco Bay, tide lands and reclaimed lands lying below the line of mean high water as established and shown on "Map No. 1, Salt Marsh and Tide Lands, situate in the County of Contra Costa, State of California, 1872", and submerged lands, that is, lands which in their

natural condition are always below the line of lowest tide. The Government took possession of the land under an order for immediate possession made by this court, and began the construction of the project. The property described in the complaint is completely closed to approach from the uplands or over tide lands at the north, east and south, by a substantially impassable iron-wire fence constructed by the Navy Department, and is bounded on the west by the waters of the Bay. The public and the owners are excluded from the use or occupancy of any of the property, except that temporary access or passage has been granted at the pleasure of the Navy Department. The property is patrolled by the Navy Department, and it has not indicated any intention of abandoning the dominion or control which it exercises over the property. The Government's opening brief states: "To complete this project the defendant's submerged lands are now and will now and will continue to be used by the Government."

The Government has moved to dismiss its action against the portion of the lands which lies below the mean high water line and to amend its complaint to exclude such land, pursuant to a request of the Secretary of War addressed to the Attorney General of the United States, as follows: "In view of the fact that certain portions of the lands named in the above mentioned condemnation proceedings are situated below the mean high water line, this Department intends to exercise on behalf of the United States the right to use the land in the exercise of the sovereign power of the United States. It is requested, therefore, that you take the necessary action to dismiss from the proceedings so much of the land as is situated below the mean high water line."

Defendants object to plaintiff's motion to dismiss.

The Government contends, first, that it has the absolute right to dismiss or abandon the proceedings against part of the property without regard to the reason for seeking such dismissal or abandonment; and, second, that apart from the question of the Government's absolute right to dismiss, the court should grant the motion because the land sought to be excluded is already subject to a servitude to the Government for use as a naval fuel supply depot by virtue of its power to control navigation.

In discussing the Government's first contention, it may be well to outline the manner in which the condemnation proceedings were initiated. Congress by Act of April 28, 1942, Public Law 531, 56 Stat. 248, specifically authorized construction of naval refueling facilities. The authorization was made effective through the appropriation of funds by the "Sixth Supplemental National Defense Appropriation Act, 1942", Public Law 528, 56 Stat. 226. The Secretary of the Navy designated the lands described in the original complaint as the site for the facility. The complaint in condemnation alleges that the proceeding is instituted under the acts of Congress above referred to, and the Second War Powers Act, 50 U.S.C.A.Appendix § 632, which provides in part that " * * * * the Secretary of the Navy * * * may cause proceedings to be instituted in any court having jurisdiction of such proceedings, to acquire by condemnation, any real property, temporary use thereof, or other interest therein, * * * that shall be deemed necessary, for military, naval, or other war purposes * * *. Upon or after the filing of the condemnation petition, immediate possession may be taken and the property may be occupied, used, and improved for the purposes of this Act * * *."

Inseparable, of course, from the power of the Government to take property in eminent domain is the right of the owner to receive just compensation for his property, whether the taking be temporary or permanent, and the complaint alleges that "there are sufficient funds now available with which plaintiff can and is authorized to pay just compensation for the lands sought to be taken and condemned herein."

Based on the allegations of the complaint and the application of the Government for immediate possession of the land, it obtained an order for immediate possession, which recites among other things that the United States has made adequate provision for the payment of just compensation for the property by virtue of the appropriation made by Congress therefor "so that it shall not be necessary for the United States to deposit any sum of money or other form of security for the purpose of securing payment of compensation to the parties entitled thereto", and which directs the United States Marshal to place the Government in possession of the property. The lands sought to be dismissed from this proceed-

ing are described in the order for immediate possession.

Prior to the commencement of the action defendant Santa Cruz Oil Corporation granted the Navy Department permission to enter upon its lands, stating that it was with the understanding that the Navy Department intended to acquire in the immediate future the property owned by it. Defendant North Bay Realty & Development Co. refused to permit an entry upon its lands before action was brought.

The Government has expressed no intention of surrendering its exclusive possession of the property which is the subject of the motion to dismiss. The agreed statement of facts says that "the Navy Department has not advised anyone or otherwise indicated any intention of * * * abandoning the dominion or control so exercised by it." The Government states in its opening brief, p. 15: "To complete this project the defendant's submerged lands are now and will continue to be used by the Government." It may be assumed from the nature of the improvement that the Navy Department intends to remain in possession of the lands indefinitely.

The motion to dismiss is made because of the administrative determination by the Navy Department, subsequent to the filing of the condemnation action, that it is unnecessary for the Government to acquire title to the property below the mean high water line. The reason for this administrative determination, the Government contends, may not be the subject of inquiry by this court on motion to dismiss.

The question for decision may be stated as follows: After obtaining possession of property through condemnation proceedings and by means of the process of this court, based on the expressed intention of the Government to pay just compensation to the owners of the property, may the Government now change its position and dismiss or abandon, as of right, its proceeding against a portion of the property and still have exclusive control and dominion over that property?

The Government states that the right to abandon or dismiss condemnation proceedings where there has not been a taking is founded upon recognition of the fact that one of the most important uses of a condemnation proceeding is that of ascertaining how much must be paid before the Government binds itself to pay anything, and that title to the property does not pass to the Government until the actual payment of compensation.

It contends that the entry into possession of the land by the condemnor does not constitute a "taking" which will prevent a subsequent abandonment. Defendants claim there was such a "taking" when the Government entered upon the land and appropriated it to its exclusive use. It appears that it will be unnecessary to decide whether the Government by appropriating the property has bound itself to acquire it, unless the Government should hereafter declare its intention to abandon the property in question and an objection to such abandonment should be made by the defendant. However, dictum in some of the cases cited by the Government on this point indicates that a taking may result from acts of the condemnor prior to the actual payment of compensation.

In Matthews v. United States, 8 Cir., 113 F.2d 452, 457, the court permitted abandonment of the condemnation proceeding but stated, "There has been no physical appropriation of Matthews' property, and on the facts shown in the record he has no rights or interests which could properly be condemned under the terms of the Act * * *. Since we have decided that the established facts preclude condemnation under the Act, it becomes unnecessary to define the circumstances under which the law permits or forbids a condemnor to abandon condemnation while continuing with its project." It will be noted that here the Circuit Court assumed that it had the right to consider the reasons for the abandonment, and that circumstances might exist which would prevent such abandonment.

In Owen v. United States, 5 Cir., 8 F.2d 992, the court held that the Government could dismiss or abandon its petition in condemnation at any time before there was a taking vesting the right to compensation. The court said: "The petition shows that it was not the government's intention to take possession of the land * * * until after judgment; and the answer of the landowners does not aver a taking of the land described in the petition."

Kanakanui v. United States, 9 Cir., 244 F. 923, was a suit on a judgment in a condemnation action which had been abandoned by the United States. The court held that there had been no taking of the property, and cited Transportation Co. v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336, where the Supreme Court said, "But acts

done in the proper exercise of governmental powers, *and not directly encroaching upon private property*, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision." (Emphasis supplied.) The court said that the consequential damages incident to the condemnation action and subsequent abandonment were not compensable. It appears that the Government had not taken possession of the property.

United States v. Stubbs, D.C., 35 F.2d 357, held valid an act providing for immediate possession by the Government without prepayment of compensation but required a deposit to be paid into court to insure payment to the owner, one of the reasons given being that the owner might be dispossessed of his property and the property later abandoned, so that the owner would have difficulty in securing compensation for the temporary loss of possession.

The Government relies on Moody v. Wickard, App.D.C., 136 F.2d 801, as authority that the Government may dismiss the proceedings after taking possession of the land. In that case the condemnor entered into possession under an option to purchase and not by order of court; and it does not appear whether the Government in that case indicated its intention to retain possession of the land.

The Government cites Yolo Water & Power Co. v. Edmands, 50 Cal.App. 444, 195 P. 463; In re Lighthouse at Hell Gate, D.C., 196 F. 174; and Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939, in support of its contention that it is proper for it to file condemnation proceedings and later abandon its action against a portion of the land originally sought to be condemned because of a claim of right to use it without paying compensation, without permitting the court to test the validity of such claim. In none of these cases does it appear that the land in question had been actually appropriated by means of the condemnation action. In Greenleaf-Johnson Lumber Co. v. Garrison, supra, plaintiff's wharf was declared a menace to navigation after the abandonment of condemnation proceedings against it; there was no physical appropriation of the wharf by the condemnor.

The Government cites no cases holding that a condemnor may take possession of property under court order, dismiss its proceedings as of right, and assert the right to retain dominion over the property. There are decisions in the state courts which follow the contrary rule set forth in 30 C.J.S., Eminent Domain, § 341: "Where the condemning party has entered into possession of the land pending proceedings to condemn, it must surrender and abandon the possession in order to render a discontinuance effectual." In Wilcox v. St. Paul & N. P. Ry. Co., 35 Minn. 439, 29 N.W. 148, 150, the Minnesota court said: "The motion for leave to abandon the proceedings was denied upon the ground that the corporation had not abandoned, and did not intend to abandon, its possession. This ruling of the court is sustained by the decision of this court at the present term in Witt v. St. Paul & N. P. Ry. Co., post, [35 Minn. 404, 29 N.W.] 161." In the last mentioned case [35 Minn. 404, 29 N.W. 162] the same court said, "Whether the law would permit an abandonment by the corporation in any case, where it has taken possession of the land sought to be acquired pending the proceedings for condemnation, with the express or tacit consent of the owner, we need not now inquire. But we think the court was right, in any event, in holding that a corporation, acquiring possession under such circumstances, cannot assume to abandon the proceedings, and retain the possession and use of the premises in the continued prosecution of the enterprise * * *."

In City of Detroit v. Empire Development Co., 259 Mich. 524, 244 N.W. 150, 151, the court held that the City of Detroit, having entered into possession of land under contract, might abandon condemnation proceedings brought subsequently, without surrendering possession. The court said, "Where, as in this case, possession was taken wrongfully, not by virtue of the statute and not through condemnation suit, and retained after discontinuance, it would seem that the owner's only remedy is in an action of ejectment. We agree with the defendant that a party may not use condemnation proceedings to obtain possession of land and discontinue suit without surrendering possession."

In Durham & N. R. Co. v. North Carolina R. Co., 108 N.C. 304, 12 S.E. 983, 984, defendants claimed the right, after a judgment of dismissal of a condemnation suit, to be placed in possession of the property. The court denied a writ of restitution on the ground that the defendants were not

put out of possession by virtue of the court's process "but in an entirely different way, with which the court had no connection whatever." But the court clearly indicates what its decision would have been had plaintiff used the process of the court to obtain possession: "Generally the writ of restitution lies in favor of a party after a judgment or order of the court, under and in pursuance of which he has been put out of possession of property, has been reversed, set aside, or adjudged void, to restore him to the possession of which he had been so deprived. The law will not allow its process granted and enforced erroneously, by improvidence, mistake, or abuse, to work injury to a party. It will always and promptly, in appropriate cases, restore the party prejudiced by its process to the like possession, plight, and condition as he had at the time the same was executed, as nearly and as completely as practicable. The court seeks and is anxious to do justice, and as well to preserve its own integrity and honor." I think the same rule should apply when an entry is permitted in reliance on the statement that condemnation proceedings will be brought.

■ So long as the Government intends to and does retain the possession it obtained under court order, I conclude that it may not dismiss as of right its action against the land, and that the court has jurisdiction to consider the further contention of the Government that it is entitled to use the property without paying compensation to the owners.

The second contention of the Government is that the private rights of defendants in the tide and submerged lands are subject to the navigation servitude of the Federal Government, and that the project constructed on these lands is in aid of navigation.

The facilities for the naval fuel supply depot consist of tanks for the storage of fuel constructed on the uplands, a "T" shaped pier, constructed from Molate Point out into the navigable waters of the Bay, to which naval vessels are moored for refueling, a pipeline running from the storage tanks to the terminus of the pier for the purpose of conveying the fuel oil directly to the vessels being refueled. A channel outside the "T" end of the pier has been dredged to accommodate larger naval craft; and another channel has been dredged inside the top of the "T" to accommodate smaller craft. The Government states that the depot services naval craft of all types engaged in war duties in both domestic and foreign waters.

Defendants contend that such use of the lands is a taking of private property for public use, for which compensation must be paid.

■ It is well established that title to the banks and bed of a navigable stream are subject to the navigation servitude. The nature of the servitude is defined by cases cited in the Government's brief: "The public right of navigation". Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083; Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. The shores and lands lying under navigable waters are held to be subject to a trust for the public uses of navigation and fishery. Being subject to this trust, they were publici juris; in other words, they were held for the use of the people at large. Stockton, Atty. Gen. of New Jersey, v. Baltimore & N. Y. R. Co., C.C., 32 F. 9. A waterway was designated the "greatest public utility" in Hawkins Point Light-House Case, C.C., 39 F. 77, 88. The court in that case also said that "The bed of a navigable river remains subject to an easement of navigation." In controlling, improving and regulating the navigability of waters the Government traditionally acts for the benefit of the navigating public. Unquestionably, it may deepen channels, widen streams, erect lighthouses, build bridges, construct dams, and make similar improvements, without compensating the owners of land subject to the navigation servitude. All these things are clearly in aid of the "greatest public utility", and all but one of the cases cited by the Government on this point involve improvements of that type. It does not follow, however, that the Government may assert its power over lands subject to this servitude to construct improvements for the exclusive use of one of its agencies; that it may appropriate land for the construction of a naval fuel supply base, exclude defendants and the general public from the use and benefit of the facility, and claim that it is acting for the benefit of the public under the navigation power.

The Government argues that since the navy is essential to preserve commerce and navigation, an improvement which benefits the navy is in aid of navigation.

It strongly relies upon the case of Bailey et al. v. United States, 62 Ct.Cl. 77. In that case plaintiffs leased submerged lands from the State of Virginia, on which they planted oysters. Congress authorized the construction of a naval operating base on contiguous lands and provided for payment of just compensation for the lands and appurtenant rights, specifically mentioning riparian rights. As a result of the construction of the base plaintiffs' oyster beds were damaged as follows: A portion of the submerged land on which the oysters were planted was surrounded by a bulkhead and filled between the bulkhead and the shore so that it became dry land. A channel was dredged through another portion of the tract leased by plaintiffs to enable naval vessels to reach the base. . Plaintiffs filed action for damages in the Court of Claims for the destruction of the oyster beds. The Court of Claims held, first, that Congress did not authorize the taking of the submerged lands in question, and that the acts of the naval officials in taking lands without authority could not bind the Government to pay for such taking. The Court then considered whether the taking was in the exercise of the right of the sovereign to do what is necessary to improve navigation. The court said: "It is said by plaintiffs that 'A taking for naval purposes is not for purposes of navigation.' This statement might, under some limitations, be true, but hardly so when the 'naval purposes' directly involve navigation. It would be strange indeed if the sovereign might exercise its dominant right to provide necessary facilities for commercial vessels but could not provide any additional facilities made necessary for the use of naval vessels. If twenty-foot channels perchance served all necessary commercial purposes the dominant power had exhausted itself when they were supplied and deeper channels might not be provided for naval vessels. Or because commercial vessels need not dock at navy yards, facilities for naval vessels can not be supplied. And it is said that, 'Purposes of navigation implies a use for the public good' from which it is argued that 'the improvement must be for a public use, in a public capacity, and not in a mere governmental capacity.' The distinction is rather difficult to comprehend and it is more difficult to comprehend that in the face of a great national emergency the furnishing of necessary facilities for the Navy is not for the common public good."

■ I think there is no question that the Government may dredge channels deep enough to serve all vessels, including those of its navy. In such case the "naval purpose" does directly involve navigation. But I am not in accord with the view that when land once submerged is filled in by the Government and facilities for naval vessels alone constructed thereon, and the public excluded therefrom, it follows that the improvement is in aid of the public right of navigation. In stating and rejecting the argument that "because commercial vessels *need not* dock at navy yards, facilities for naval vessels cannot be supplied", the author of the opinion in the Bailey case does not squarely meet the actual situation, which is that commercial vessels *are excluded* from navy yards. This is the basis of the distinction urged by the plaintiffs in that case between an "improvement for a public use, in a public capacity" (such as a public highway), and one made "in a mere governmental capacity" to be used solely by a particular government agency.

Where the public is excluded the Government is not acting under its power to improve navigation as a public utility, but under its constitutional power to maintain a navy.

■ There is no question that the furnishing of necessary facilities for the army and navy, in times of national emergency and during peacetime, is "for the common public good," as is the furnishing of necessary facilities to all branches and agencies of the Government. Congress has adequately provided for the acquisition of and the payment of compensation for property which the Government requires in order that it may construct such necessary facilities. But it does not follow that because the navy uses the navigable waters and acts for the public good, the Government may appropriate submerged lands to construct improvements for the exclusive benefit of the navy, without payment therefor, any more than it may appropriate such lands, under its navigation power, for the construction of a building to supply office facilities to the War Production Board.

The motions to dismiss and for leave to amend the complaint will be denied.