ALAMEDA GATEWAY, LTD., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Port of Oakland, Defendant/Intervenor.

No. 97–160 L.

United States Court of Federal Claims.

Dec. 23, 1999.

Diane D. Hastert, Honolulu, HA, for plaintiff. Robert H. Thomas, of counsel.

Fred R. Disheroon, with whom were Lois J. Schiffer, Assistant Attorney General and David M. Cohen, Director, U.S. Department of Justice, Washington, DC, for defendant. Shivaun White, U.S. Army Corps of Engineers, San Francisco, CA, of counsel.

Carter J. Stroud, Port of Oakland, Oakland, CA, for defendant/intervenor.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiff, Alameda Gateway, Ltd. ("AGL"), the owner of a 29–acre marine industrial site, seeks compensation from the United States, acting through the Secretary of the Army, for an alleged taking effected by the removal of portions of two piers and the dredging of submerged lands beneath and contiguous to the piers in the inner harbor of Oakland, California. The authority of the Secretary of the Army is exercised in this matter through the United States Army Corps of Engineers (the "Corps" or "defendant government" or "defendant"). The Port of Oakland is a defendant/intervenor.[1]

The matter is before the court on plaintiff's Motion for Partial Summary Judgment and defendant's Motion for Summary Judgment, both as to the liability phase of the case.[2]

## I. Background

AGL is a California limited partnership with its principal place of business in Alameda, California.[3] The issues in this case are whether the portion of AGL's property claimed to have been taken is subject to the federal navigational servitude and, if so, whether that fact relieves the United States from liability for a taking. *See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment (Pl.'s Mem.) at 3. In making these determinations, the court must first consider the unique history of AGL's property.

In 1820, the Mexican governor of Alta, California conveyed a large parcel of Spanish land, which included what is now AGL's property, to Luis Peralta as part of the Rancho San Antonio.[4] *Id.* at 3. After California achieved statehood in 1850, the United States Board of Land Commissioners confirmed the Mexican title and, in 1874, issued a patent to Luis Peralta's son, Antonio Peralta, for the "Peralta Grant" pursuant to the Treaty of Guadalupe Hidalgo.[5] *Id.* at 3–4. Because

---

1. The intervenor supports the position of the United States and has deferred to the defendant government in its defense of this matter. Defendant/Intervenor['s] Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp.") at 1.

2. On motion of the parties, the court bifurcated the case into liability and damages phases. Order dated September 3, 1998.

3. The city of Alameda sits on an island in San Francisco Bay, directly across the Oakland Estuary/Oakland Inner Harbor from the City of Oakland.

4. The Rancho San Antonio included most of the land in the eastern San Francisco Bay area and the creek now known as the Oakland Estuary.

5. The 1848 treaty defined the United States' obligation to resolve California property issues after the Mexican War. On March 3, 1851, Congress enacted "An Act to Ascertain and Settle the Private Land Claims in the State of California" establishing a comprehensive claims settlement procedure which the United States Board of Land Commissioners administered. Act Mar. 3, 1851, c. 41, 9 Stat. 631. The Act barred all claims which were not presented to the Board. *Id.* In 1854, the United States Land Commission

the State of California did not claim any rights in either the confirmation or patent process, title to the submerged property did not vest in California under the Equal Footing Doctrine.[6] *Id.* at 4. *See also Summa Corp. v. California,* 466 U.S. 198, 209, 104 S.Ct. 1751, 80 L.Ed.2d 237 (1984). Accordingly, lands within the Peralta Grant are free of the public trust easement that otherwise encumbers tidelands in the State of California. Pl.'s Mem. at 4; *Summa,* 466 U.S. at 209, 104 S.Ct. 1751.

In 1874, the Corps initiated the Oakland Inner Harbor project. Pl.'s Mem. at 4.[7] At that time, Southern Pacific Company ("Southern Pacific") owned the property at issue here and operated it as a railroad facility. *Id.* at 4, 6. In 1941, United Engineering Company ("United Engineering") acquired the site and converted the railroad facility into a ship building and repair yard. *Id.* at 6.

In anticipation of the United States' involvement in World War II, United Engineering contracted with the Department of the Navy ("Navy") in late 1941 to transform the Alameda site into a major ship repair yard. *Id.* at 6–7. In January 1942, United Engineering retained America Dredging Company to perform the dredge work to create a basin and, by year end, United Engineering had constructed four piers in the basin. *Id.* at 8. Dredging for the project proceeded under a permit issued by the Corps of Engineers dated December 11, 1942, Pl.'s Ex. 20, and the wharf construction

was authorized by a permit dated June 14, 1944, Pl.'s Ex. 21. Under the standard provisions of its contract, the government took title to the piers as well as to the new buildings and equipment. Pl.'s Mem. at 9. The Navy leased the piers, buildings and equipment to United Engineering; in turn, United Engineering allowed the Navy to use the basin without cost. *Id.*

At the conclusion of World War II, Matson Navigation Company ("Matson") purchased United Engineering. *Id.* Matson performed ship repair work at the site and continued to lease the piers, buildings and equipment pursuant to the Navy contract. *Id.* at 9–10.

In March 1959, Todd Shipyards Corporation ("Todd") purchased the site from Matson. *Id.* at 10. Todd assumed the Navy contract and entered into a new lease agreement with respect to the equipment and piers at the Alameda site. Pl.'s Ex. 27. Todd purchased the previously leased property from the Navy in January, 1970. Pl.'s Ex. 28. The Navy's deed included a release of its interest in the land at the site. *Id.*

Thirteen years later, in 1983, AGL purchased the Alameda site from Todd. Pl.'s Mem. at 11. At the time of purchase, only two piers remained.[8] *Id.* Intending to develop a marina in the basin, AGL applied to the Corps for a permit in 1985. *Id.* The Corps denied the permit application because it had begun planning with the Port of Oakland to improve the adjacent Oakland Inner Harbor.[9] *Id.*

---

confirmed the claim of Antonio Peralta to the "portion of the land known by the name of San Antonio." Plaintiff's Exhibits ("Pl.'s Ex.") 49–50. At oral argument in this case, plaintiff abandoned the suggestion in its complaint that the failure of the United States to assert a navigational servitude during the confirmation process abrogated the navigational servitude. Transcript of May 25, 1999 on Cross Motions for Summary Judgment ("Tr.") at 13.

6. The Equal Footing Doctrine provides that each state becomes the owner of the beds of the navigable streams within that state upon admission to the Union. *Block v. North Dakota,* 461 U.S. 273, 277, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), *citing Pollard v. Hagan,* 44 U.S. (3 How.) 212, 222–23, 11 L.Ed. 565 (1845).

7. Evidence suggests that the Corps filled the majority of the marshland of western Alameda when

it dredged the Oakland Estuary to create the inner harbor. Pl.'s Mem. at 4 n.9.

8. The piers, referred to as the western (Pier 2) and eastern (Pier 4) piers, extended approximately 600 feet into the harbor. *United States v. Alameda Gateway, Ltd.,* 953 F.Supp. 1106, 1107 (N.D.Cal.1996); Pl.'s Mem. at 11. Pier 2 is a concrete pier; Pier 4 is a badly deteriorated wooden pier. *Alameda Gateway, Ltd.,* 953 F.Supp. at 1107; Pl.'s Mem. at 11.

9. In 1985, AGL sued the Corps to compel the issuance of a permit. The matter was tried in 1986. *Alameda Gateway, Ltd. v. United States,* Case No. 85–8802 MHP, United States District Court for the Northern District of California. As far as this court is aware, no final decision has been issued in the case. Pl.'s Mem. at 11.

In the Water Resources Development Act of 1986 ("WRDA"), 33 U.S.C. §§ 2201–2330 (1994), Congress authorized the Corps to undertake the "Oakland Inner Harbor Improvement Project" to develop the Port of Oakland into a competitive port. Pl.'s Mem. at 12. The project required the widening and deepening of the shipping channels of the harbor and the creation of a new turning basin in the area of the harbor where AGL's piers were located.

In 1995, the Corps informed AGL that it was moving the harbor line shoreward and would require the removal of portions of AGL's piers pursuant to sections 10 and 11 of the River and Harbors Act ("RHA"), 33 U.S.C. §§ 403 and 404.[10] *See* Pl.'s Ex. 22. The Corps directed AGL to submit a plan for shortening its two piers to prevent their interference with the new turning basin. When AGL failed to submit a plan, the Corps retained a contractor to remove the pier ends. The Corps then sought recovery of the removal costs from AGL in the Federal District Court in California.[11]

In turn, AGL filed suit in this court alleging a physical taking under the Fifth Amendment to the United States Constitution. AGL seeks compensation for the partial destruction of its piers and the opening of the area under the piers and other submerged areas to dredging and public use. While AGL recognizes that a "federal navigational servitude" runs in favor of the United States under § 8 of Article I of the U.S. Constitution in aid of the exercise of the commerce power and that the navigational servitude may exempt the United States from the obligation to pay "just compensation" under the Takings Clause of the Fifth Amendment, AGL asserts that the navigational servitude does not encumber its property. Pl.'s Mem. at 26–27. Defendant has argued that plaintiff's property is encumbered by the navigational servitude and that no compensation is owed in this case. Defendant United States' Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 7.

The court now considers the cross-motions for summary judgment which the parties have filed on the issue of liability.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule of the Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Health and Human Services*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S.

---

**10.** Section 10 of the Rivers and Harbors Appropriations Act of 1899 provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines ....

33 U.S.C. § 403 (1994). The federal government is charged under the Commerce Clause of the Constitution with ensuring that navigable waterways remain free of obstruction. *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

Further, section 11 of the Act states:

Where it is made manifest to the Secretary of the Army that the establishment of harbor lines is essential to the preservation and protection of harbors he may, and is, authorized to cause such lines to be established, beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him. ...

33 U.S.C. § 404.

**11.** In its August 1996 opinion, the district court for the Northern District of California granted the Corps' motion for an injunction barring AGL from interfering with the partial removal of its piers and thereby upheld the regulatory validity of the Corps' removal of the piers under the RHA. *Alameda Gateway, Ltd.*, 953 F.Supp. at 1112.

144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Jay*, 998 F.2d at 982. If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014). The Federal Circuit has stated that "a takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996).

### B. Takings Claim

 The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V. "A taking occurs when the rightful property, contract, or regulatory powers of the Government are employed to control rights or property which have not been purchased." *Heydt v. United States*, 38 Fed.Cl. 286, 305 (1997), *quoting Alde, S.A. v. United States*, 28 Fed.Cl. 26, 33 (1993). To invoke Tucker Act jurisdiction, a plaintiff bringing a takings claim must be prepared to allege that the government has acted lawfully with the exception of paying compensation. *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1361–62 (Fed.Cir. 1998); *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898–99 (Fed.Cir.1986).

 The case law addresses two categories of takings—physical and regulatory. A physical taking occurs when the government seizes property. *Store Safe Redlands Assocs. v. United States*, 35 Fed.Cl. 726, 728 (1996). As the Supreme Court observed in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), *quoting Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall) 166, 181, 20 L.Ed. 557 (1871), "where real estate is actually invaded ... so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." The hallmark of a physical taking is government occupation of real property. *See e.g., Loretto*, 458 U.S. at 426, 102 S.Ct. 3164.

 By contrast, a regulatory taking occurs when the government imposes a condition on private property that limits or prohibits any beneficial use of the property by the private owner. *Id.* at 729. As Justice Holmes observed in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."[12]

---

**12.** In *Penn Central Transportation Company v.* *City of New York*, 438 U.S. 104, 124, 98 S.Ct.

■ For a takings claim to succeed under either a physical invasion or a regulatory takings theory, a claimant must first establish a compensable property interest. *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed.Cir.1993); *Avenal v. United States*, 33 Fed.Cl. 778, 785 (1995), *aff'd*, 100 F.3d 933 (1996).

### C. Compensable Property Interest

■ In *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), the Supreme Court stated that "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." In determining whether a claimant holds compensable property rights, the court must evaluate the "bundle of rights" acquired as of the time the claimant obtained title to the property in issue. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1026, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

Here, AGL asserts that it possesses a compensable property interest in the Oakland Estuary that extends to the original length of its piers, entitling it to compensation for the Corps' partial destruction of the piers. The Corps, however, counters that the piers were subject to the navigational servitude and, accordingly, were not compensable property interests.

In deciding what bundle of rights AGL acquired in the Alameda site, the court must consider whether the property at issue was subject to the navigational servitude.

### D. Navigational Servitude

■ The Commerce Clause of the United States Constitution gives Congress the power "to regulate Commerce with foreign nations, and among several states, and with the Indian Tribes." U.S. Const. Art. 1, § 8, cl. 3. The Supreme Court established that com-

merce "comprehend[s] navigation," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 192, 6 L.Ed. 23 (1824), and later held that congressional power to regulate navigation includes the authority to control the nation's navigable waters as public property. *Gilman v. City of Philadelphia*, 70 U.S. (3 Wall.) 713, 724, 18 L.Ed. 96 (1865).

■ The power to regulate navigation confers upon the United States a public right of navigation, thereby impressing navigable waters of the United States with a navigational servitude. *United States v. Rands*, 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 249, 74 S.Ct. 487, 98 L.Ed. 666 (1954); *Confederated Tribes of Colville Reservation v. United States*, 964 F.2d 1102, 1107 (1992); *United States v. 412.715 Acres of Land*, 53 F.Supp. 143, 148–49 (N.D.Cal.1943). The federal navigational servitude defines the boundaries within which the government may supersede private ownership interests to improve navigation. *Owen v. United States*, 851 F.2d at 1408, 1409 (Fed.Cir.1988). The federal navigational servitude extends to the entirety of a stream and to the stream bed below the ordinary high-water mark. *Owen*, 851 F.2d at 1412 (Fed.Cir.1988). Land or property within the bed of a navigable stream is always subject to the potential exercise of the navigational servitude. As the Supreme Court observed:

> The proper exercise of this [federal] power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*Rands*, 389 U.S. at 123, 88 S.Ct. 265.

■ Because the rights of a title holder are subordinate to the dominant servitude, *United States v. Chicago, Milwaukee, St.*

2646, 57 L.Ed.2d 631 (1978), the Supreme Court set forth the following three-factor test for courts to consider in determining whether governmental regulation results in a taking: (1) the character of the government action; (2) the economic impact of the regulation on the property owner; and (3) the extent to which the regulation interferes with distinct investment-backed expectations.

Paul & Pacific R.R., 312 U.S. 592, 597, 61 S.Ct. 772, 85 L.Ed. 1064 (1941), the government owes no compensation for the taking of, injury to or destruction of a riparian owner's property which is located in the bed of a navigable stream. *Owen*, 851 F.2d at 1409.

■ The Supreme Court has stated, however, that the navigational servitude does not create a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation. *Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). *See also Owen*, 851 F.2d at 1416. Rather, the court must consider the factual circumstances presented in each case vis-a-vis the scope of the navigational servitude to determine whether the public action has effected a taking. *Id.*

The parties here dispute whether the AGL's property was located in the bed of a navigable waterway and thereby subject to the federal navigational servitude. Pl.'s Mem. at 31–32; Defendant United States' Response to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Resp.") at 5. Accordingly, the court must decide whether all or any of the portion of the Alameda site affected by the Corps' action was "navigable" in a sense which would subject it to the navigational servitude.

### E. Navigability Determination

In determining whether a particular water body is navigable, courts must first consider the purpose for which the concept of navigability is invoked. *Kaiser Aetna*, 444 U.S. at

171, 100 S.Ct. 383. As the Supreme Court observed in *Kaiser Aetna*, the jurisprudence has defined the term "navigable waters" for purposes other than delimiting the boundaries of the navigational servitude, in particular: (1) to define the scope of federal regulatory jurisdiction conferred by authority of the commerce clause;[13] (2) to establish the extent of the Corps' authority under the RHA; and (3) to establish the parameters of the admiralty and maritime jurisdiction of a federal court. *Kaiser Aetna*, 444 U.S. at 171–72, 100 S.Ct. 383.

Recognizing that Congress's regulatory authority under the Commerce Clause is not coextensive with the scope of the navigational servitude, the Supreme Court stated, "While [a body of water] may be subject to regulation by the Corps of Engineers, acting under the authority delegated it by Congress in the Rivers and Harbors Appropriation Act, it does not follow that the [regulated waterway] is also subject to a public right of access." *Kaiser Aetna*, 444 U.S. at 172–73, 100 S.Ct. 383. *See Boone v. United States*, 944 F.2d 1489, 1493 (9th Cir.1991) ("Though similarly grounded in the commerce clause, the navigational servitude is distinct from the power to regulate navigable waters.").

■ In *Kaiser Aetna*, the Supreme Court elaborated further on the test of navigability for navigational servitude purposes, setting forth four factors: first, whether the waterway was navigable in its natural state and comparable to the major natural bodies to which the servitude has been applied; second, whether the waterway was located on private property;[14] third, whether the wa-

**13.** The authority of the United States to regulate commerce on its waters is as broad as the needs of commerce. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 426, 61 S.Ct. 291, 85 L.Ed. 243 (1940). In fact, some authorities have extended the government's authority to regulate navigable water under the Commerce Clause "beyond control over waters navigable in fact to nonnavigable tributaries, waters which were once navigable in fact but are no longer so, and water neither formerly nor presently navigable but which may be made navigable by reasonable improvements." *Boone*, 944 F.2d at 1492–93 (footnotes omitted).

**14.** The *Kaiser Aetna* test incorporates an inquiry as to whether a compensable property interest exists, including an examination of whether the

bundle of property rights includes the "right to exclude," the taking of which the Supreme Court prohibits absent compensation. *Kaiser Aetna*, 444 U.S. at 179–80, 100 S.Ct. 383. The court notes that the Supreme Court decided *Kaiser Aetna* (the takings case most closely analogous to the case at issue) "on the cusp" of evolving jurisprudence distinguishing per se takings from regulatory takings. Thus, while *Kaiser Aetna* involves a *per se* taking, aspects of the analysis in the Supreme Court's opinion closely resemble the analysis expressed several years later in the area of regulatory takings. *Compare Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (regulatory taking) *with Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419,

terway became navigable through the investment of private funds; and fourth, whether the Corps consented to the improvement affecting navigability. *Kaiser Aetna*, 444 U.S. at 178–79, 100 S.Ct. 383; *Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 832 (5th Cir.1993).

### 1. Navigability of the Water in its Natural State

As an initial matter, *Kaiser Aetna* requires that a court inquire whether the waterway at issue was navigable in its natural state and comparable to the major natural bodies to which the servitude has been applied. *Kaiser Aetna*, 444 U.S. at 178–79, 100 S.Ct. 383. *See United States v. Cress*, 243 U.S. 316, 323, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (quoting *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 561, 19 L.Ed. 999 (1870)); *Dardar v. Lafourche Realty Co.*, 55 F.3d 1082, 1084 (5th Cir.1995) ("navigational servitude is ordinarily imposed on a naturally navigable waterway"); *Boone*, 944 F.2d at 1495. The Supreme Court has defined as navigable those waters which "form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *The Daniel Ball*, 77 U.S. (10 Wall.) at 563. *See Vaughn v. Vermilion Corp.*, 444 U.S. 206, 208–09, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979); *Boone*, 944 F.2d at 1495. To determine whether the portion of the Alameda site at issue was navigable in its natural state, the court reviews the specific characteristics of the property conveyed to plaintiff's predecessors in title under the terms of the Peralta Grant of 1850.

102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (physical taking).

**15.** Among plaintiff's submissions are: (1) an 1857 United States Coast survey navigation chart of San Antonio Creek, (2) a copy of an 1850 map showing part of the town of Oakland, and (3) a copy of an 1851 navigational chart of San Francisco Harbor. Pl.'s Ex. 73, 75, and 76 (dates as represented by plaintiff in its Table of Contents). Defendant's submissions include two maps dated

At the request of the court that the parties provide "one or more maps showing (1) the topography and, in particular, the shoreline of the locus in issue at or about the time of California's statehood (1850); (2) the location on such map(s) of the portions of the piers and the basin affected by the contested actions of defendant; and (3) plaintiff's property line," the parties have filed separately several coastal survey maps of the Oakland Estuary and stipulations regarding the property at issue. *See* Order dated May 28, 1999. In accordance with the court's request, the maps filed by the parties show the pier lengths which the Corps ordered removed from the Oakland Estuary and, through several nineteenth century maps, the topography of the area at or near the time of California statehood.[15]

The earliest of the maps from which a detailed comparison of the mid-nineteenth century topography of the Oakland Estuary and the present state of the property at issue can be made is dated 1857 and was submitted by defendant. The 1857 map was reproduced by defendant as a transparency which permits the court to review the topographical features of the subject property seven years after the date of California statehood as an overlay to a 1996 map of the area. The overlay shows that the property on which the removed portions of plaintiff's piers sat was, in part, marshland. The balance of the property on which the removed portions of the piers were located lies in the Oakland Estuary beneath the waters.[16] From the maps it appears that, in their natural state, portions of plaintiff's property were waters which "form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce [was] or, [might have been] carried on with other States or foreign countries in the customary modes in which commerce is conducted by water." *See The Daniel Ball*, 77 U.S.

1857 and 1875 respectively. *See* Defendant's Maps filed August 6, 1999. The maps submitted by the parties refer to plaintiff's property by its various historical names. As defendant's maps indicate, the Oakland Estuary was formerly known as the San Antonio Estuary. *Id.*

**16.** Precise map coordinates are not necessary for the liability phase of the case. Additional detail may be relevant to the damages determination.

(10 Wall.) at 563. While the parties are in substantial agreement as to what the early maps show, the parties maintain differing positions on the legal effect of the information.

While plaintiff concedes that a portion of the property at issue was navigable in 1850, the time of California statehood, it argues that any navigational servitude that may have attached to the property at that time was extinguished by the Corps' subsequent fill of the area in the late 1800s.[17] See Pl.'s Mem. at 4; Tr. at 114. Plaintiff asserts that the property remained fast land from the late nineteenth century until 1942 when plaintiff's predecessor in interest, United Engineering, contracted with the Navy to expand United Engineering's ship repair yard by dredging the turning basin in the Oakland Harbor to facilitate the war effort. Pl.'s Mem. at 6–7; Tr. at 115. Plaintiff contends that the proper time for determining the natural state and thereby the navigability of the property is the year 1942.[18]

Although defendant urges the court to look to the condition of the property in 1983, when plaintiff acquired the Alameda site, to determine navigability (Tr. at 36–37), defendant also relies on the map evidence from the 1860s (Tr. at 35) and the 1850s (Defendant's Maps filed August 6, 1999) indicating that there was a navigable stream running through the property. Defendant also argues that through the chain of title and related title insurance policies for the property at issue, plaintiff had notice that the property was impressed with the federal navigational servitude (Def.'s Resp. at 16).[19]

 Because the navigational servitude is an exercise of sovereignty, the court looks to the navigability of the nation's waters in their natural condition at the time at which the United States first exercised sov-

ereignty over the property. See United States v. Twin City Power Co., 350 U.S. 222, 224, 76 S.Ct. 259, 100 L.Ed. 240 (1956) ("The interest of the United States in the flow of a navigable stream originates in the Commerce Clause."). Further, as directed by Kaiser Aetna, the court must compare the body of water at issue here to those major natural bodies to which the navigational servitude has been applied. See Kaiser Aetna, 444 U.S. at 178–79, 100 S.Ct. 383. Making this comparison, the court finds that the Oakland Estuary is the sort of "great navigable stream" that has been previously recognized as being "[incapable] of private ownership." Kaiser Aetna, 444 U.S. at 175, 100 S.Ct. 383 (citing United States v. Chandler–Dunbar Co., 229 U.S. 53, 69, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (private ownership of a great navigable stream is inconceivable)). The waters in the Oakland Harbor are distinguishable from the shallow waters of Kuapa Pond in Kaiser Aetna, which were separated from the adjacent bay and ocean by a natural barrier beach. In contrast to Kuapa Pond, the Oakland Estuary is directly contiguous to the Pacific Ocean and is itself a major shipping channel. Its improvement has been a part of the mission of the Corps and a subject of legislation over a period of more than 125 years. Notwithstanding the partial fill of the estuary by the Corps (to which the plaintiff points as an argument for extinguishment of the servitude), the successive projects to improve navigation in the estuary appear to the court to underscore the involvement of the plaintiff's property in the improvement of commercial navigation in the waterway. In the court's view, those portions of plaintiff's property which were submerged lands in 1850 were then impressed with the navigational servitude. The subsequent filling in aid of navigation has not extinguished that servitude.[20]

---

17. There is no suggestion in the record of any change in the topography of the subject property between California statehood in 1850 and the 1874 dredge and fill project.

18. Plaintiff conceded at oral argument that the condition of the property at the time of statehood was relevant, but argues that the natural condition test is, in this case, superseded by later events. Tr. at 22–23.

19. The court notes that the date urged by defendant—plaintiff's acquisition date—could result in differing treatment of otherwise similarly situated landowners and could even encourage a market in illegally filled lands.

20. Because a portion of plaintiff's property was a part of the various improvements to commercial navigation in the Oakland Harbor, the court does not view the navigational servitude over plain-

## 2. Ownership of the Property

*Kaiser Aetna* also requires the court to inquire whether the waterway in question was located on private property. *Kaiser Aetna*, 444 U.S. at 179, 100 S.Ct. 383. This portion of the *Kaiser Aetna* test examines whether the plaintiff ever acquired private ownership in the property and if it did acquire ownership rights, whether those rights continue or have been extinguished.

It is not contested that the plaintiff's predecessors in title acquired the property under the Peralta Grant. The property became part of the United States as property in private hands. The parties have differing views of, in particular, the impact on that private ownership of the 1942 development in connection with the war effort.

Plaintiff argues that, in 1942, United Engineering developed the turning basin at the Alameda site from private property and erected four piers in the basin without surrendering the right to exclude the public. As evidence that United Engineering retained its private property rights, plaintiff points to United Engineering's refusal to yield its title in the basin to the Navy during contract negotiations for the 1942 dredging and construction work.[21] Pl.'s Mem. at 7. Plaintiff also asserts that all of

the successors in interest to United Engineering have maintained the site as private property. Pl.'s Mem. at 9–10; Tr. at 67–73. Plaintiff points to the testimony of a series of witnesses to establish that the successive property owners possessed and exercised the right to exclude the public from the site. Tr. at 71–72. Plaintiff argues that its evidence of the exercise of the right to exclude is uncontradicted and adds that "public access over a private piece of property" does not compromise the private nature of the property absent an affirmative grant or implied waiver of the right to exclude the public. *Id.* at 71. Defendant has not contradicted plaintiff's evidence on the point. The court agrees that neither plaintiff nor its predecessors in interest have compromised their rights to exclude the public.

Defendant contends that the private rights which United Engineering retained under the 1941 Navy contract were limited to the facilities only and did not include the real estate. Tr. at 107. This is unsupported in the record. The plaintiff's predecessor in interest, Todd, refused to sell its real estate to the Navy in 1942. Pl.'s Ex. 14.

Defendant adds that what United Engineering acquired under its contract with the

---

tiff's property as having ever been temporarily or otherwise extinguished. Recognizing the distinction between navigability for purposes of Corps' regulatory authority and navigability for purposes of the federal navigation servitude, the court is persuaded, on the facts of this case, by the reasoning in *Economy Light & Power Co. v. United States*, 256 U.S. 113, 123, 41 S.Ct. 409, 65 L.Ed. 847 (1921), where the Court stated that a "river having navigable capacity in its natural state and capable of carrying commerce among the States is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions." *See Loving v. Alexander*, 745 F.2d 861, 867 (4th Cir.1984) (court found that the portion of the river in question met "the federal test of navigability" because it was once—though no longer—navigable in fact); *but see Boone v. United States*, 944 F.2d 1489, 1498–1500 (9th Cir.1991) (court rejects the concept of a "dormant navigational servitude").

**21.** Plaintiff explains that "[d]uring the Navy Contract negotiations, the government inquired whether United Engineering would surrender ti-

tle in the Basin, but it firmly refused and [thereby] retained its private property rights to the Basin ...." Pl.'s Mem. at 7. Plaintiff directs the court's attention to an excerpt of a document (Pl.'s Ex. 14), dated December 1, 1941, prepared by United Engineering in response to a questionnaire from the Navy's Assistant Supervisor of Shipbuilding for the use of the negotiating officer in handling contracts for plant facility expansion:

Q 20. If the proposed expansion is to be constructed on land owned by your company, are you willing that (sic) the Government acquire title to the land prior to the construction of the proposed facilities? (If land is to be acquired, this item of expense should be included as part of Appendix A.)

A 20. This company prefers to retain title to the property in view of its desire to continue in the general ship repair business after the present Emergency. Furthermore, in view of the determination of the local Supervisor of Shipbuilding not to invest any Navy funds in the acquisition of land, the entire cost of acquiring land for the proposed expansion has been borne by this company. Accordingly, it seems equitable that the title to such land should remain in this company.

*Id.*

Navy "was the right to use the piers against the general public, but subject to preexisting rights of the United States over the waters in which the piers were located." Tr. at 107. Defendant is correct here, but only to the extent that such waters were subject to such pre-existing rights. The government's response assumes the question at issue. To the extent the plaintiff had private rights, it has not lost them by any failure to exclude the public. *See, e.g., California Housing Securities, Inc. v. United States,* 959 F.2d 955, 958 (Fed.Cir.1992) (Among the essential aspects of private property is the right to exclude others).

### 3. Navigability Achieved Using Public or Private Funds

The third factor to consider in determining whether the navigational servitude attaches to a parcel of property is whether the waterway became navigable in fact through the investment of private funds. *Kaiser Aetna,* 444 U.S. at 179, 100 S.Ct. 383.

By contract dated August 1941 and several subsequent letters of intent and amendments, plaintiff's predecessor in interest, United Engineering, agreed to provide a number of fleet tugs to the Navy for the war effort. Pl.'s Ex. 13, 14, 15. In turn, the Navy agreed to finance the expansion of United Engineering's facilities to ensure that the vessels were completed within the time required. *Id.* Because "[t]he United Engineering shipyard at Alameda was constructed 'at Navy expense,'" defendant asserts that public money funded the dredging effort at the site, the construction of the docks and piers, and the purchase of the land,[22] buildings, and machine tools for the shipyard. Defendant United States' Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Rep.") at 10.

Plaintiff does not dispute that its predecessor in the chain of title, United Engineering, required substantial financial assistance from the Navy to transform the subject property into a major ship repair facility. Pl.'s Mem. at 6. Thus, the court finds that, in contrast to the property in *Kaiser Aetna,* the site became navigable in fact in this century at substantial public expense.

### 4. Corps' Consent to the Improvements Affecting Navigability

The fourth factor of the test set forth in *Kaiser Aetna* requires the court to consider whether the Corps consented to the improvement—here, the pier construction—affecting navigability. *Kaiser Aetna,* 444 U.S. at 179, 100 S.Ct. 383. The Supreme Court has stated that such consent "can lead to the fruition of a number of expectancies embodied in the concept of 'property'—expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over the management of the landowner's property." *Id.*

Plaintiff asserts that the Corps' consent may be inferred from the fact that no federal permits were issued under the RHA for United Engineering's initial dredging of the basin or for the construction of its piers. Pl.'s Mem. at 8–9; Tr. at 16.

The problem with plaintiff's argument is that permits were, in fact, issued for the 1942 improvements containing language clearly acknowledging the rights of the United States in terms which appear to this court to invoke the navigational servitude. Pl.'s Ex. 20, 21. Defendant contends that plaintiff had ample notice of the existence of the federal navigational servitude, pointing first and, in the court's view, most significantly to the language in the permit issued to plaintiff's predecessor in interest, United Engineering.[23] Def.'s Rep. at 12–13. Additionally, a

---

**22.** Defendant's assertion that it purchased the land at the Alameda site is contradicted by the record, which indicates that United Engineering, plaintiff's predecessor-in-interest, owned all of the land except 1.66 acres of a parcel which United Engineering leased from the City of Alameda. *See* Pl.'s Ex. 14.

**23.** Defendant points to four of the permit provisions, specifically, paragraphs c, e, f, and g, which refer to the navigational servitude:

(c) That there shall be no unreasonable interference with navigation by the works herein authorized....

(e) That no attempt shall be made by the permittee [United Engineering] or the owner to forbid the full and free use by the public of

permit for wharf construction issued to United Engineering in July 1944 contained the same terms as appeared in the 1942 permit. *Id.* at 13.

Furthermore, the title insurance policy issued to plaintiff by Western Title Insurance Company on October 21, 1983 for the purchase of the Alameda site from Todd also contained a reference to rights in favor of the United States for commerce. *Id.* at 15. Particularly, the policy stated that title was subject to "[r]ights and easements for commerce, navigation and fishery in favor of the public, or the federal, state, county or municipal government and a right of way in favor of the public to said waters adjacent thereto." *Id.* at 15 n. 5.[24]

Plaintiff challenges defendant's characterization of the referenced title insurance policy provisions, arguing that the provisions do not define the navigational servitude. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem in Opp.") at 15. Rather, plaintiff contends, defendant has shown only that "a portion of AGL's property is subject to the

> all navigable waters at or adjacent to the work or structure.
> (f) That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of War, it shall cause unreasonable obstruction to the free navigation of said water, *the owner will* be required, *upon due notice from the Secretary of War*, to *remove or alter the structural work* or obstructions caused thereby *without expenses to the United States, so as to render navigation reasonably free, easy and unobstructed* ....
> (g) That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused or result from future operations undertaken by the Government for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.
> Def.'s Rep. at 12–13 (emphasis added).

24. Defendant further asserts that the Grant Deed from Matson to Todd, recorded on March 11, 1959, also referenced the federal navigational servitude, stating that the property title was subject to:

> Paramount rights of the United States of America for purposes of commerce and navigation

Corps' *regulatory* jurisdiction, which ... is not coterminous with the navigational servitude." *Id.* at 14 (italics in original). Plaintiff may be correct with respect to the portions of the title policies relating to harbor lines. But plaintiff does not address the language "[r]ights and easement for commerce [and] navigation ... in favor of the public, or the federal government" which is a plain statement of the navigational servitude. *See The Daniel Ball*, 77 U.S. at 564 ("[R]ivers must be regarded as public navigable rivers in law ... when they are used ... in their ordinary condition, as highways for commerce ....").

■ Finally, plaintiff asserts that defendant surrendered its interests in the property during the sale to Todd, plaintiff's predecessor in title, in 1970. Plaintiff argues that *"[t]he federal government's Quitclaim Deed [to Todd,] recited that the government was releasing and forever quit claiming 'all right, title and interest of the Government' in and to the Piers and the other property." Id.* at 19 (italics in original).

The Quitclaim Deed states:

> over that portion of the premises lying within the lines of Oakland harbor as said lines now exist or may hereafter exist.
> *Id.* at 13. Defendant notes that the terms of the Transfer Agreement executed on March 10, 1959 between Matson, Todd and the Navy bound Todd to the same restrictions on title to which Matson was subject. *Id.* at 14.
> Defendant adds that Todd's insurance policy with California Pacific Title Insurance Company for the purchase of the Alameda Shipyard dated March 11, 1959 contained language indicating that Todd's title was subject to the navigational servitude. Def.'s Resp. at 18. Under the section describing encumbrances on the title, the policy identified "[p]aramount rights of the United States of America, for purposes of commerce and navigation, over that portion of premises lying within the lines of Oakland Harbor, as said lines now exist or may hereafter be changed." *Id.*
> In addition, the policy issued to plaintiff noted the limitations on the title due to the navigational servitude using the identical language as found in Todd's insurance policy with California Pacific Title Insurance Company. Def.'s Resp. at 19. The policy issued to plaintiff stated that the title interest was subject to the "[p]aramount rights of the United States of America, for purposes of commerce and navigation, over that portion of premises lying within the lines of Oakland Harbor, as said lines now exist or may hereafter be changed." *Id.*

That the Government, in consideration of the payment to it of FIVE HUNDRED TWENTY–FIVE THOUSAND ($525,000) DOLLARS, receipt of which is hereby acknowledged, does hereby remise, release, and forever quitclaim to TODD SHIPYARDS CORPORATION and its successors and assigns, without covenant, representation or warranty, expressed or implied, all right, title and interest of the Government in and to [certain described property which included the site's facilities and equipment and four parcels of land] . . . .

Pl.'s Exh. 28. Although the release language in the document is broad and does not include an express reservation of public rights, the court nonetheless determines that defendant did not abrogate the federal navigational servitude in the conveyance to Todd.

The court notes that the United States "acting by and through the Department of the Navy" executed the Quitclaim Deed to Todd. Pl.'s Exh. 28. However, the Navy is not the governmental agent designated to act for and on behalf of the United States in matters involving improvements to the nations's waterways. Rather, Title 33, United States Code, Section 540 provides that "improvements of rivers, harbors, and other waterways shall be under the jurisdiction of . . . the Department of the Army under the direction of the Secretary of the Army and the supervision of the Chief of Engineers." 33 U.S.C. § 540. Section 541 adds that as "organized in the Office of the Chief of Engineers, United States Army, by detail from time to time from the Corps of Engineers" shall be a board of engineers whose duties shall include considering public commercial interests when evaluating the desirability of river and harbor improvement projects. *Id.* at § 541. There is nothing in the record that even suggests that the Navy had the authority to compromise the federal navigational servitude or, for that matter, release the terms of the Corps' permits.

The court does not believe that the release language in the Quitclaim Deed could have terminated the Corps' rights to require the removal of the piers under the 1942 and 1944 permits. The court finds that the Quitclaim Deed lacks the "unmistakable terms" required by the Supreme Court to surrender a sovereign power in a government contract. In *Bowen v. Public Agencies Opposed to Social Security Entrapment, et al.*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the Supreme Court stated:

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, . . . we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract. . . . Rather, we have emphasized that '[w]ithout regard to its source, sovereign power . . . is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'

*Id.* (Citations omitted). The court cannot conclude that the United States has taken any action to relinquish its rights. Neither its consent to the construction of piers and maintenance of a dock nor the terms of the Navy's sale of property extinguished the navigational servitude.

## III. Conclusion and Order

◼ The court finds that a portion of plaintiff's property was navigable in its natural condition at the time of California statehood. The court further finds that neither plaintiff nor its predecessors-in-interest have relinquished the private rights in the portion of plaintiff's property that was non-navigable in its natural condition. The parties do not dispute that improvements affecting the navigability of the Alameda site, specifically, the 1874 fill project and the 1942 dredging effort, were made at public expense and with the knowledge of the Corps. The United States has not relinquished the federal navigational servitude which attached to the property in 1850 or its rights under the permits issued by the Corps of Engineers in 1942 and 1944. Therefore, the court decides that, in accordance with its application of the *Kaiser Aet-*

*na* factors, the portion of the property which was navigable at the time of California statehood (including all improvements thereon) remains subject to the federal navigational servitude and is excluded from plaintiff's compensable property interest in the Alameda site. Because the 1942 and 1944 permits have continued in full force and effect, all removed portions of the piers—including those lying in areas which were outside of the navigational servitude in 1850—must be removed at plaintiff's expense.

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is GRANTED in part, as to the dredging of those portions of its presently submerged lands which are situated on the area of Oakland Estuary shown as marshland according to the 1857 map of the property and otherwise DENIED. Defendant's Motion for Summary Judgment is GRANTED in part, as to all removed portions of the piers and as to the dredging of the portions of the presently submerged lands which are situated on the area shown as land lying beneath the waters of the Oakland Estuary according to the 1857 map of the property, and otherwise DENIED. Having determined that the government is liable for taking a portion of plaintiff's property (albeit less than plaintiff has alleged), the court must consider the damages owed at trial. The parties shall, on or before January 21, 2000, file with the court a joint status report containing the parties' proposals for further proceedings in this matter.

IT IS SO ORDERED.